**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**John SPILOTRO; Herbert Blitzstein;
and Joseph C. Blasko,
Defendants-Appellees.**

No. 84–1245.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1985.

Decided Sept. 26, 1986.

Eric Johnson, Las Vegas, Nev., for plaintiff-appellant.

Oscar B. Goodman, Las Vegas, Nev., Raymond J. Smith, Ellen G. Robinson, Chicago, Ill., A.J. Kramer, Asst. Federal Public Defender San Francisco, Cal., for defendants-appellees.

Before KENNEDY, ALARCON, and NELSON, Circuit Judges.

KENNEDY, Circuit Judge:

The United States appeals from a district court order suppressing evidence seized pursuant to four search warrants. The evidence was seized from defendant Anthony Spilotro's jewelry store and from defendant Joseph Blasko's home, person, and safe deposit box. The district court granted defendants' motions to suppress, finding the warrants were unconstitutionally general. Although the subsequent death of Anthony Spilotro has rendered the case against him moot, we affirm the district court's order insofar as it concerns the other defendants. We do so with little enthusiasm, for there was probable cause to believe that Spilotro and his associates, with Blasko's assistance, were engaged in loan sharking and bookmaking. The warrants, however, were hopelessly general and thus insufficient to justify the search that led to a plain view discovery of vast amounts of stolen jewelry, a plain view that in other circumstances may have supported the seizure.

In 1977 and 1978, the Federal Bureau of Investigation investigated the activities of organized crime suspects in Las Vegas, Nevada. The suspects were Anthony Spilotro, an alleged member of Chicago's La Costa Nostra; Herbert Blitzstein, an associate of Anthony Spilotro; John Spilotro, Anthony's brother and associate; and Joseph Blasko, an officer of the Las Vegas Metropolitan Police Department. Physical and electronic surveillance, as well as un-

dercover information, indicated Anthony Spilotro was conducting loan shark and bookmaking operations from his jewelry store, the Gold Rush, Ltd. Anthony Spilotro was sole shareholder of the Gold Rush, Ltd.; Blitzstein and John Spilotro were corporate officers and directors. In addition to loan sharking and bookmaking, the investigation indicated a few stolen gems had been fenced through the Gold Rush; it also revealed that Blasko gave Spilotro and the others confidential information on local and federal law enforcement activities, and provided electronic equipment to detect government surveillance and monitor law enforcement activities.

On June 18, 1978, the government requested a United States Magistrate issue approximately seventy warrants. In support of the request, FBI agent Hall submitted a 157–page affidavit detailing the results of the investigation. The affidavit is a tedious chronology of surveillance and telephone taps, showing a general pattern of criminal wrongdoing without providing strong evidence of isolated criminal transactions; it does, however, provide probable cause to believe that Spilotro supervised a loan shark and bookmaking operation. Blitzstein spent hours phoning Chicago to relay odds and other information, and he often met with Spilotro. Authorized wiretap interceptions are described, confirming that Blitzstein telephoned gambling information to Chicago and took instructions from Spilotro for the collection of debts. Blasko's cooperation with Spilotro in advising of progress of federal and local investigations is also documented. The affidavit covers such activities for over a year and a half. It indicates that the Gold Rush Jewelry Store is secure, with electronic locks on interior doors to control access. It is reasonable to conclude that Spilotro and the others feel safe conducting their private business there. After reading the affidavit and the prepared warrants for two to three hours, the magistrate issued the requested warrants.

FBI agents from various offices were sent to Las Vegas to execute the warrants. To prepare the agents for the searches,

Hall and FBI Supervisor Bryant first held a general meeting to explain the objectives of the search at the various locations covered by the warrants. Later the agents divided into search groups for special briefings. Supervisor Bryant was the leader of the Gold Rush search group. He read the Gold Rush warrant to the searching agents in his group and explained they were to search for evidence of loan sharking, bookmaking, and gambling. Bryant also gave his agents a copy of the affidavit pages relating to stolen gemstones and told them that only a few loose gemstones were included in the search warrant and that these would probably be wrapped in tissue paper.

The Gold Rush warrant directed a search as follows:

[C]ertain property, namely notebooks, notes, documents, address books and other records; safe deposit box keys, cash, gemstones and other items of jewelry and other assets; photographs, equipment including electronic scanning devices, and other items and paraphernalia, which are evidence of violations of 18 U.S.C. § 1084, 1952, 1955, 892–894, 371, 1503, 1511, 2314, 2315, 1962–1963, and which are or may be: (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense.

On June 19, 1978, the FBI executed the warrant for the Gold Rush. Upon entering the store, Agent Tickle and one other agent went upstairs to locate and shut down the electronic scanning devices, items listed in the warrant. The two agents saw over 2,000 rings without stones in one of the upstairs rooms, but they did not inspect the rings or search the upstairs rooms further. They went downstairs to help other agents secure the store and conduct body searches. This completed, Tickle began searching a back room. He saw a ring lying on a workbench, and, without touch-

ing the ring, noticed scratchings on the interior which suggested to him that the manufacturer's trademark had been sanded off. Tickle picked up the ring and confirmed his suspicion. He also saw what appeared to be gold dust on the workbench as well as a jewelry tool used to sand ring trademarks. He examined the other rings lying on the same workbench, looked at a few of the rings from the upstairs room, and concluded that the rings had all been altered.

Tickle called Strike Force Attorney Fisher to relate the facts of the discovery and to ascertain whether a second warrant was required. After questioning Tickle at some length, Fisher advised him the agents could make a plain view seizure of the jewelry. The agents first attempted to examine each of the several thousand pieces of jewelry separately. After determining the procedure would take too long, they again contacted Fisher. Fisher advised them to forego inventory of each item and to use a close proximity test: if Tickle found several pieces of jewelry on one tray that were altered, the entire tray of jewelry was to be seized; if he found several trays in a display window that contained altered rings, the entire display was to be seized. Using this test, the agents seized over 5,000 pieces of jewelry for later investigation. The electronic surveillance equipment from upstairs and some undated horse wagers were also seized from the Gold Rush.

That same day search warrants for Blasko's home and person were executed. The following day, June 20, 1978, a search warrant for Blasko's safe deposit box was issued and executed. These warrants authorized the seizure of:

> ... notebooks, notes, documents, address books, and other records; safe deposit box keys, cash, and other assets; photographs, equipment including electronic scanning devices, and other items and paraphernalia, which are evidence of violations of 18 U.S.C. 1084, 1952, 892–894, 371, 1503, 1511, 2314, 2315, 1962–1963, and which are or may be: (1) property that constitutes evidence of the commis-

sion of a criminal offense; or (2) contraband, the fruits of crime, or things otherwise criminally possessed; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense.

Incriminating records and papers were seized pursuant to these warrants.

On May 25, 1984, the district court granted defendants' suppression motions, finding the warrants for the Gold Rush and Blasko's home, person, and safe deposit box to be unconstitutionally general. On August 9, 1984, the district court denied the government's motion for reconsideration seeking severance of the invalid portions of the warrants and application of the then recently announced good faith exception to the exclusionary rule. The district court held that the doctrine of severance set forth in *United States v. Gomez-Soto,* 723 F.2d 649, 654 (9th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984), could not be invoked to sustain any part of the challenged warrants because none of the terms in the warrants were particular enough to survive Fourth Amendment scrutiny. The court held that the Hall affidavit could not be relied upon to cure the general nature of the warrants because the affidavit was not attached to the warrants or incorporated by express reference as required by *United States v. Hillyard,* 677 F.2d 1336, 1340 (9th Cir. 1982). Finally, while the district court found that the good faith exception to the exclusionary rule announced in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), would be applied retroactively, the "interests of finality" prevented it from reexamining a suppression order entered prior to the *Leon* decision. This interlocutory appeal followed.

We begin by noting that there is no question that defendant Blasko has standing to challenge the search of his home, person, and safe deposit box. There is, however, room for disagreement as to whether Blitzstein and John Spilotro, neither of whom have any proprietary interest

in the Gold Rush, Ltd., have sufficiently reasonable expectations of privacy in the Gold Rush premises to permit them to object to its search. *See, e.g., Rawlings v. Kentucky,* 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980) (defendant must show he has a "legitimate expectation of privacy" in the area to be searched) (quoting *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). The government, however, in no way questioned the reasonableness of any defendant's expectation of privacy in the district court. Given this, as well as the fact that "standing" as that term is used in Fourth Amendment jurisprudence after *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), does not present a jurisdictional question, *United States v. Hultgren,* 713 F.2d 79, 83 n. 6 (5th Cir.1983); *cf. Steagald v. United States,* 451 U.S. 204, 208–11, 101 S.Ct. 1642, 1646–47, 68 L.Ed.2d 38 (1981) (government can lose right to question existence of reasonable expectation of privacy if issue not raised in timely fashion), we decline to determine whether Blitzstein or John Spilotro has standing to challenge the Gold Rush search. *See United States v. Sherwin,* 539 F.2d 1, 5 n. 4 (9th Cir.1976) (en banc) (declining to consider standing challenge on appeal of a suppression order "since this argument was neither raised before the district court nor originally assigned as a ground for appeal in this court"). Rather, we will assume, as the parties apparently did below, that Blitzstein and John Spilotro have sufficient standing to contest the Gold Rush search. *See United States v. Mendoza,* 722 F.2d 96, 97 n. 1 (5th Cir.1983).

■ We next consider whether the four warrants at issue in this appeal describe the items to be seized with sufficient particularity to be valid under the Fourth Amendment. We review de novo the district court's finding that the warrants lack sufficient particularity. *United States v. McClintock,* 748 F.2d 1278, 1282 (9th Cir. 1984), *cert. denied,* —— U.S. ——, 106 S.Ct. 75, 88 L.Ed.2d 61 (1985).

■ The Fourth Amendment requires that a warrant particularly describe both the place to be searched and the person or things to be seized. The description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized. *See McClintock,* 748 F.2d at 1282; *Hillyard,* 677 F.2d at 1339. This requirement prevents general, exploratory searches and indiscriminate rummaging through a person's belongings. *McClintock,* 748 F.2d at 1282. It also ensures that the magistrate issuing the warrant is fully apprised of the scope of the search and can thus accurately determine whether the entire search is supported by probable cause. *See Hillyard,* 677 F.2d at 1339.

■ The specificity required in a warrant varies depending on the circumstances of the case and the type of items involved. Warrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible. *See United States v. Cardwell,* 680 F.2d 75, 78 (9th Cir.1982). In determining whether a description is sufficiently precise, we have concentrated on one or more of the following: (1) whether probable cause exists to seize all items of a particular type described in the warrant, *see, e.g., McClintock,* 748 F.2d at 1283; *United States v. Offices Known as 50 State Distributing Co.,* 708 F.2d 1371, 1374 (9th Cir.1983), *cert. denied,* 465 U.S. 1021, 104 S.Ct. 1272, 79 L.Ed.2d 677 (1984); (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, *see, e.g., United States v. Pollock,* 726 F.2d 1456, 1466 (9th Cir.1984); *Gomez-Soto,* 723 F.2d at 653–54; *Cardwell,* 680 F.2d at 78; *Hillyard,* 677 F.2d at 1340; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued, *see, e.g., Cardwell,* 680 F.2d at 78; *Hillyard,* 677 F.2d at 1339–40. *Accord United States v. Cortellesso,* 601 F.2d 28, 32 (1st Cir.1979),

*cert. denied,* 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980).

■ We conclude that the warrants here do not describe the items to be seized with sufficient particularity, and we cannot conscientiously distinguish this case from others in which we have held warrants invalid because of their general terms. *See, e.g., United States v. Cardwell,* 680 F.2d 75 (9th Cir.1982); *VonderAhe v. Howland,* 508 F.2d 364 (9th Cir.1974) (civil action contesting warrant executed by IRS). As we discuss below, the government could have narrowed most of the descriptions in the warrants either by describing in greater detail the items one commonly expects to find on premises used for the criminal activities in question, or, at the very least, by describing the criminal activities themselves rather than simply referring to the statute believed to have been violated. As the warrants stand, however, they authorize wholesale seizures of entire categories of items not generally evidence of criminal activity, and provide no guidelines to distinguish items used lawfully from those the government had probable cause to seize.

The Gold Rush warrant authorized, among other things, the seizure of address books, notebooks, notes, documents, records, assets, photographs, and other items and paraphernalia evidencing violations of the multiple criminal statutes listed. The government did not know, or at least did not recite, the precise identity, type, or contents of the records sought. Although the government's investigation may have established probable cause to believe loan sharking and gambling activities took place at the Gold Rush, it had not yet revealed the location of Spilotro's records relating to these activities, the physical appearance of these records, or the names of the debtors and bettors which would appear in them; nor had its investigation revealed what law enforcement information Blasko had passed on to Spilotro or his associates or how that information was recorded or retained. Nevertheless, a more precise description of the items sought was possible. For the loan shark-

ing and gambling charges, the FBI sought items it claims are typically found in the possession of loan sharkers and bookmakers. The Gold Rush warrant should have named or described those particular items. *See Gomez-Soto,* 723 F.2d at 654. For instance, the warrant might have authorized the seizure of "records relating to loan sharking and gambling, including pay and collection sheets, lists of loan customers, loan accounts and telephone numbers, line sheets, bet slips, tally sheets, and bottom sheets." *See United States v. Timpani,* 665 F.2d 1, 4–5 (1st Cir.1981). For the obstruction of justice charge, the supporting affidavit described in some detail the alleged services Blasko provided to his codefendants. Consequently, the warrant could have sought records referring to Joseph Blasko or containing information regarding grand jury or law enforcement activities.

The use of generic descriptions in the Gold Rush warrant still might not have been fatal had the warrant more specifically identified the alleged criminal activities in connection with which the items were sought. Reference to a specific illegal activity can, in appropriate cases, provide substantive guidance for the officer's exercise of discretion in executing the warrant. *See United States v. Washington,* 782 F.2d 807, 818 (9th Cir.1986) (search limited to items evidencing "involvement and control of prostitution activity" narrow enough to satisfy particularity requirement); *United States v. LeBron,* 729 F.2d 533, 538–39 (8th Cir.1984) (reference to specific illegal activities such as narcotic sales or credit transaction business provides a particularized description and inherent guidelines); 2 W. LaFave, *Search and Seizure* § 4.6, at 104–05 (1978) (reference to criminal conduct satisfies particularity requirement where nature of crime permits ready identification of its instrumentalities); *cf. United States v. Dennis,* 625 F.2d 782, 792–93 (8th Cir. 1980) (warrant referring to extortionate credit transactions in addition to listing four federal statutes upheld); *Timpani,* 665 F.2d at 4–5 (upholding warrant referring to loan sharking and gambling in addi-

tion to listing eight federal statutes); *Spinelli v. United States*, 382 F.2d 871, 886 (8th Cir.1967) (warrant referring to bookmaking upheld since greater particularity not possible), *rev'd on other grounds*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). In this case, however, the only limit on the search and seizure was the requirement that the items seized be evidence of a violation of any one of thirteen statutes, some of exceptional scope. The statutes are 18 U.S.C. § 1084 (transmission of wagering information); § 1952 (travel in aid of racketeering enterprises); § 1955 (illegal gambling business); §§ 892–894 (making, financing, or collecting extortionate extensions of credit); § 1503 (influencing officer or juror); § 1511 (obstruction of law enforcement with intent to facilitate illegal gambling business); §§ 2314–2315 (transportation, sale, or receipt of stolen goods, securities, moneys, or counterfeiting articles); §§ 1962–1963 (racketeering activity); and § 371 (conspiracy to commit offense against or defraud the government). The statutes in question likely would encompass several hundred separate criminal acts, but no specific criminal transactions were set forth in the warrant. This effort to limit discretion solely by reference to criminal statutes was inadequate to meet the standards for specificity in a warrant. Our opinion in *United States v. Hayes*, 794 F.2d 1348 (9th Cir.1986), is not to the contrary. The warrants in *Hayes* referred to evidence of the purchasing, dispensing, and prescribing of controlled substances, a set of activities significantly more narrow than the whole range of acts proscribed by the thirteen statutes cited in the warrant in the case before us.

The same infirmities render invalid the warrant's authorization to search for "gemstones and other items of jewelry." The government concedes that the Hall affidavit did not provide probable cause to believe large blocks of stolen jewelry would be found at the Gold Rush, thus perhaps justifying a seizure, at least temporarily, of all jewelry in the store. Rather, the Hall affidavit mentioned only a few stolen diamonds. The warrant, however, provides no

basis for distinguishing these diamonds from others the government could expect to find on the premises. Thus, even putting aside the fact that the Hall affidavit did not provide probable cause to believe the stolen gems would still be in the Gold Rush at the time of the search, the authorization to seize "gemstones and other items of jewelry" was far too broad, bearing no relation to whatever probable cause the government had to search the store for stolen gems or jewelry.

We have previously invalidated warrants similar to the ones in the present case. In *United States v. Cardwell*, 680 F.2d 75 (9th Cir.1982), we invalidated a warrant authorizing the seizure of

> corporate books and records, including but not limited to cancelled and duplicate checks, check stubs, journals, ledgers, weekly summaries, driver trip envelopes, and daily schedules, of [certain named corporations], which are the fruits and instrumentalities, of violations of 26 U.S.C. § 7201.

680 F.2d at 76. Since the descriptions found deficient in *Cardwell* were at least as precise as the descriptions at issue here, we are constrained by *Cardwell* and the authorities on which it in turn relies to hold the warrant a general one.

In *Cardwell* we noted that warrants reciting generic classifications and criminal statutes without more usually do not give the officers who execute them guidance to determine what items to seize. 680 F.2d at 78. We stressed the importance of the information available to the government upon issuance of the warrant, stating that "generic classifications in a warrant are acceptable only when a more precise description is not possible." *Id.* (quoting *United States v. Bright*, 630 F.2d 804, 812 (5th Cir.1980)). In *Cardwell* the government's investigation centered upon specific business records, enabling it to refine the scope of the warrant by reference to particular criminal episodes, time periods, and subject matter. Because the government knew "exactly what it needed and wanted," we held there was no need for so broad a

warrant. 680 F.2d at 78 (quoting *Vonder-Ahe v. Howland,* 508 F.2d 364, 370 (9th Cir.1974)). The government did not know exactly what it needed in the case at bar, but we have shown how the descriptions might have been significantly narrowed.

This reasoning is elaborated by our more recent decisions in *United States v. Crozier,* 777 F.2d 1376, 1381 (9th Cir.1985); *United States v. Storage Spaces Designated Nos. "8" and "49",* 777 F.2d 1363, 1369–70 (9th Cir.1985); and *United States v. Gomez-Soto,* 723 F.2d 649 (9th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984). In *Crozier* we held overbroad a warrant seeking "[m]aterial evidence of violation [of] 21 USC 841, 846...." 777 F.2d at 1381. Similarly, in *Gomez-Soto* we held void a portion of the warrant that authorized the seizure of "[p]apers ... evidencing failures to file currency transaction reports as required by Title 31, United States Code." 723 F.2d at 651 n. * *. There the DEA sought articles typical of those used by narcotics traffickers, so it could have employed more precise descriptions. As in this case, the limitation by way of statutory reference alone was not enough. 723 F.2d at 653–54. By contrast, in *Storage Spaces* we applied *Cardwell* to sustain a warrant where the government lacked information necessary to describe the items to be seized more precisely. *Storage Spaces,* 777 F.2d at 1369–70. Whether generic descriptions are adequate depends in part upon the necessity for their use. In our case, however, the government cannot show that the extreme generalities of the warrant were required by all the circumstances of the case.

Our conclusion regarding the generic descriptions in the Gold Rush warrant applies with equal force to the warrants for Blasko's home, person, and safe deposit box. In an effort to support its claim that the Blasko warrants could not have been more particular, the government seeks to compare them with a warrant, not at issue on this appeal, for Blasko's desk at the Las Vegas Police Department. The warrant for Blasko's office desk, issued and executed the same day as two of the other Blasko warrants, employed otherwise generic descriptions but specifically limited the items to be seized to those "concerning Anthony Spilotro, Herbert Blitzstein or the Gold Rush Limited Jewelry Store." The government argues that the limiting phrase in the desk warrant was the only way agents could distinguish among all the law enforcement material expected to be found in Blasko's office desk, much of which would have no relevance to the crimes being investigated. It suggests, however, that the same limitation was not necessary in the case of law enforcement materials found in Blasko's home, safe deposit box, and person, where the mere location of such material would, under the facts of this case, make them highly suspect as evidence of obstruction of justice. The government claims the difference in the warrants demonstrates that the three warrants at issue were sufficiently particular.

The government's argument, while superficially appealing, is not persuasive. The specificity of the desk warrant shows that the government knew how to use more specific terms in the warrants in question here. Although not all the information provided by Blasko to the other defendants necessarily would be found in documents referring to Spilotro, Blitzstein, or the Gold Rush, the warrants could have limited the written materials to be seized to those "concerning grand jury and law enforcement activities, including those referring to Spilotro, Blitzstein, or the Gold Rush." The Blasko warrants make no attempt to describe or identify the contents of the writings sought or the crimes to which they are connected. The generic descriptions in the Blasko warrants, limited by statutory reference alone, lack the requisite particularity for the same reasons such descriptions are inadequate in the Gold Rush warrant. *See United States v. Washington,* 782 F.2d 807, 819 (9th Cir. 1986) (warrant overbroad where, among other things, no reason to believe records in suspect's home evidencing criminal activity could not be described as such).

Our conclusion that the warrants for Blasko's home, person, and safe deposit box violate the Fourth Amendment need not depend on their lack of particularity alone. The list of criminal statutes expands each warrant rather than limits it. The affidavit sections concerning Blasko primarily discuss aid he allegedly gave his codefendants in alerting them to law enforcement surveillance and investigations. Nothing in the affidavit suggests Blasko was involved with Spilotro's gambling and loan sharking activities or his sale of stolen gems. Yet the Blasko warrants refer to the same thirteen criminal statutes enumerated in the warrant for the Gold Rush, expanding the warrant well beyond obstruction of justice violations. Thus, with the exception of a few criminal statutes, i.e., 18 U.S.C. §§ 371 (conspiracy to commit offense against or defraud the government) and 1511 (obstruction of criminal investigations and law enforcement), the government did not have probable cause to believe that Blasko had violated the statutes listed in the warrants.

█ Finally, the government argues that all four of the warrants exhibit the required degree of specificity when read in light of the Hall affidavit upon which they were based. We are unable to rely on the affidavit to cure the generality of the warrants, however, since it was not attached to and incorporated by reference in the warrants as required by this court's decision in *United States v. Hillyard*, 677 F.2d 1336, 1340 (9th Cir.1982). To hold otherwise would do more than "expand" *Hillyard*, as the government argues, but rather would effectively overrule it. Such a request will only be considered by an en banc court.

We note in passing, however, that this would be an inappropriate case in which to confine the holding in *Hillyard*. The Hall affidavit is a nonindexed, unorganized, day to day narration, 157 pages in length. It contains neither a specific list nor a detailed description of the items to be seized. The affidavit does not provide the information needed to limit the general terms in the warrant. *See Cardwell*, 680 F.2d at 79.

Moreover, only those pages of the affidavit relating to the few stolen diamonds were made available to the agents. Given the nature of the affidavit and the fact that the agents were given but a small portion of it, the government's argument that the agents were somehow constructively guided by the affidavit in executing the warrants is unpersuasive.

█ The government urges us to uphold any valid portion of the warrants under the doctrine of severance. In this circuit we follow the rule that where invalid portions of a warrant may be stricken and the remaining portions held valid, seizures pursuant to the valid portions will be sustained. *United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir.1982). That doctrine requires, however, that identifiable portions of the warrant be sufficiently specific and particular to support severance. *Cardwell*, 680 F.2d at 78. We cannot make that finding here. The government argues that the warrants' direction to seize the items we have not yet discussed—i.e., scanning devices, cash, and keys for safe deposit boxes—are all sufficiently specific. In some cases we might be persuaded to say that, given the difficulty of describing such items with more particularity, the description used would be sufficient, absent, say, information from an inside source designating key numbers or currency denominations. Here, however, the cash and keys sought were not related in the warrant to specific crimes but rather were only a relatively insignificant part of the sweeping search for evidence of any violation of the thirteen statutes. In this context the cash and safe deposit box keys are not sufficiently separable from the rest of the warrant to allow severance. *See United States v. Christine*, 687 F.2d 749, 754 (3d Cir.1982); *United States v. Cook*, 657 F.2d 730, 735 n. 6 (5th Cir.1981).

█ This leaves the scanning devices alone, but in the context of a far more extensive warrant and a far more extensive

search, all of which is invalid as too general, the scanning device seizure too may not stand. The warrant simply lumps the scanning devices with the other categories of items described without connecting them with any particular criminal activity. The warrants here were not ones in which the items were set forth in textually severable portions. All of the listed items were related to all of the thirteen statutes. The case is thus unlike the one presented in *Gomez-Soto* where separate paragraphs could be treated in isolation; and even there only one of twelve paragraphs needed to be stricken, the balance being retained. In consequence, the severance of even this item is inappropriate. Moreover, since the affidavit does not itself detail the particular items to be seized, we cannot consider it as a basis for severance, *see Cardwell*, 680 F.2d at 79 (citing *VonderAhe v. Howland*, 508 F.2d 364, 372 (9th Cir.1974)), even assuming severance could be based on an affidavit not incorporated in the warrant as required by *Hillyard*, 677 F.2d at 1340.

■ Having determined not to sever any portion of the warrants at issue, we reject the government's argument that the jewelry seized during the search of the Gold Rush was properly seized as being in plain view. A requisite of plain view seizure is that the view be taken from a place and in circumstances where the viewing officer was entitled to be present. *See, e.g., United States v. Chesher*, 678 F.2d 1353, 1356 (9th Cir.1982); *United States v. Wright*, 667 F.2d 793, 796 (9th Cir.1982). Here the plain view seizure was in the context of officers executing an essentially general warrant, and the justification for the plain view is therefore absent. Even if we were to say that the scanning device was severable from the warrant and properly seized, the plain view seizure of the jewelry was not incident to the search for that particular item, and the jewelry seizure could not be supported with reference to it.

Finally, we consider whether evidence obtained pursuant to the warrants may be admissible nevertheless under the good faith exception to the exclusionary rule recognized by the Supreme Court in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon* the Supreme Court held that evidence obtained pursuant to a facially-valid search warrant later found to be invalid is admissible if the executing officers acted in good faith and in objectively reasonable reliance on the warrant. *Id.* 104 S.Ct. at 3421; *United States v. Crozier*, 777 F.2d 1376, 1381 (9th Cir.1985). In so concluding, the Court observed that there may be cases in which a warrant is "so facially deficient—*i.e.*, in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Leon*, 104 S.Ct. at 3422.

■ The holding in *Crozier* controls this aspect of the case before us. In *Crozier* we held that an agent could not rely reasonably on an overly broad warrant limiting a search only to evidence of violation of two statutes, at least absent specific assurances from the magistrate that the overbreadth concern was without merit. 777 F.2d at 1381–82. Here there was no such assurance from the magistrate. If the agent's conduct in *Crozier* was not reasonable and not within the rule in *Leon*, neither was it here, where the warrant authorized a search for evidence of violation of thirteen broad criminal statutes. Under the law of the circuit, binding on this panel, the exception to the exclusionary rule recognized by the Supreme Court in *United States v. Leon* is inapplicable to the conduct of the officers here. *See also United States v. Washington*, 782 F.2d 807, 819 (9th Cir.1986) (overbroad warrants so facially deficient that reliance not reasonable); *but cf. United States v. Accardo*, 749 F.2d 1477, 1481 (11th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985) (applying good faith exception to overbroad warrant).

Accordingly, the suppression order of the district court is AFFIRMED.

ALARCON, Circuit Judge, concurring:

I concur in Judge Kennedy's well crafted opinion under compulsion of the law of this circuit as expressed in our decisions in *United States v. Cardwell,* 680 F.2d 75 (9th Cir.1982) and *United States v. Washington,* 782 F.2d 807 (9th Cir.1986). As pointed out by Judge Kennedy, had the warrant contained a description of the crimes committed by the defendants instead of a citation to the statutes criminalizing such conduct, the warrant may have met our standards of particularity. Majority opinion, page 963. In *United States v. Timpani,* 665 F.2d 1, 4–5 (1st Cir.1981), the First Circuit upheld a warrant containing a similar list of generic terms, which was followed by a listing of several statutes, because specific reference was made to the crimes of loan sharking and gambling. *Id.* at 5. The court in *Timpani* stated: "it is difficult to see how the search warrant could have been made significantly more precise." *Id.* The only substantial difference between the warrants in *Timpani* and those before us is that here the words "loan sharking and gambling" were not used to refer to the crimes specifically described in elaborate detail in the 157 page affidavit.

I find it ironic that we can trust law enforcement officers to use their training and specialized knowledge to make arrests and searches incident thereto *without* a warrant on facts that appear innocent to the untrained eye, but we cannot assume that experienced FBI agents have read the statutes recited in a search warrant and will limit their search to evidence of these crimes. *See United States v. Bernard,* 623 F.2d 551, 560 (9th Cir.1980) (search of a mobile home without a warrant valid as incident to a lawful arrest where probable cause existed based on conduct, which although, "innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer" (quoting *Davis v. United States,* 409 F.2d 458, 460 (D.C.Cir.), *cert. denied,* 395 U.S. 949, 89 S.Ct. 2031, 23 L.Ed.2d 469 (1969)).

In *United States v. Washington,* 782 F.2d at 819, we determined, without remanding for an evidentiary hearing, that the officers did not act in good faith in relying on an overbroad warrant. The Eleventh Circuit, in *United States v. Accardo,* 749 F.2d 1477 (11th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 314, 88 L.Ed.2d 295 (1985), concluded that it could not review the good faith of officers who had seized evidence under an insufficiently particular warrant without an evidentiary hearing in the district court because "[i]t is not clear that we have had the opportunity to consider all the circumstances in this case." *Id.* at 1481. The court in *Accardo* remanded to the district court to afford the parties "a hearing on the good faith issue." *Id.* Unfortunately, we did not discuss *Accardo* in our opinion in *Washington,* although the Eleventh Circuit published its decision 13 months earlier.

The Supreme Court has instructed us to construe the descriptive words in a search warrant "in a common sense fashion." *United States v. Cardwell,* 680 F.2d at 77. In *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), the Supreme Court, in discussing the preference to be accorded to searches under a warrant stated that "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." *Id.* at 106, 85 S.Ct. at 744 (citing *Jones v. United States,* 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697 (1960).

I am troubled that in this doubtful and marginal case we are compelled by the law of this circuit to hold a search under a warrant invalid notwithstanding our conclusion that probable cause existed for an arrest of the defendants for loan sharking and bookmaking. The existence of probable cause would have justified a search without a warrant and the seizure of all items in plain view. Thus, contrary to the instruction of our Supreme Court, that we should reward officers who obtain warrants from neutral magistrates, we have penalized their conduct and denied them an opportunity to testify to their good faith in

attempting to satisfy the requirements of our Constitution. I think we have gone astray.