CONSTANCE CAMILLE SMITH, Petitioner v COMMISSIONER OF INTERNAL REVENUE, Respondent; CHARLES LOUIS SMITH, A.K.A. BENJAMIN CHARLES SMITH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket Nos. 20265-88, 20640-88
United States Tax Court
T.C. Memo 1991-80; 1991 Tax Ct. Memo LEXIS 100; 61 T.C.M. (CCH) 1998; T.C.M. (RIA) 91080; February 28, 1991, Filed *100 Decisions will be entered under Rule 155. Constance Camille Smith and Charles Louis Smith, pro se. Brenda M. Fitzgerald, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income tax as follows: Additions to Tax
Sec.
Sec.
6653(b)(1) or
6653(b)(2) or
Sec.
Sec.
Year
Deficiency
6653(b)(1)(A)
6653(b)(1)(B)
6654
6661
1983
$ 28,328
$ 14,164
*
$ 1,733
$ 7,082
1984
5,562
2,781
*
349
1,391
1985
22,878
11,439
*
1,311
5,720
1986
14,881
11,161
*
720
3,720
1987
16,833
12,625
*
903
4,208
Respondent has conceded the section 6661 additions to tax. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules *101 of Practice and Procedure. These cases were consolidated under Rule 141. After concessions, the issues remaining for decision are: (1) whether certain evidence obtained through a search warrant should be suppressed; (2) whether petitioners had unreported income for the years in issue; and (3) whether petitioners are liable for the additions to tax for fraud enumerated above. Petitioners resided in Oregon at the time the petitions in these cases were filed. The notices of deficiency in these cases were based on analysis of petitioners' expenditures during the years in issue. On March 28, 1990, respondent filed identical requests for admissions in each case, asserting that all of the income and expense items determined in the notices of deficiency were attributable to each petitioner. Petitioners did not respond to those requests, and, accordingly, the facts set forth therein were deemed admitted in accordance with an order expressly pointing out that respondent's legal arguments or conclusions were not deemed admitted. At trial, the Court stated that the items of income and expense set forth in respondent's requests for admissions would not be attributed to both petitioners with *102 a resulting double taxation. Respondent was ordered to propose an allocation of the amounts attributable to each petitioner. Respondent has now made concessions, notwithstanding the deemed admissions, to reflect allocations to the individual petitioners. Petitioners presented no persuasive refutation of respondent's allocations, as discussed below. Our findings of fact concerning petitioners' income are thus based on petitioners' admissions and on respondent's post-trial concessions reflecting evidence at trial. FINDINGS OF FACT In 1981, Mr. Smith was convicted in the United States District Court for the Northern District of Alabama for fraudulent use of an airman's certificate, displaying misleading aircraft marks, importing marijuana, possessing a controlled substance not part of the cargo manifest, and possessing marijuana with intent to distribute. On March 31, 1981, he received a 10-year prison sentence. In 1981, Mr. Smith incurred legal fees in excess of $ 20,000. Petitioners were divorced on September 14, 1982. On September 24, 1982, Mr. Smith escaped from prison. In 1983, Mr. Smith met Woodrow W. Brown (Brown) in Alabama. Mr. Smith and Brown agreed that Mr. Smith *103 would fly planes smuggling drugs for Brown. In 1986, Brown was convicted on Federal drug charges including possessing, distributing, and smuggling cocaine. In 1987, Brown became an informant for the United States and entered a Federal witness protection program. On October 24, 1987, Mr. Smith and his son, Charles Smith, were arrested by United States marshals at a truck stop in Klamath Falls, Oregon. At the time of the arrest, Mr. Smith claimed to be Sam Blakely, and his son claimed to be Barrymore Rockefeller III. Mr. Smith was carrying a New Mexico driver's license, a Florida driver's license, a South Carolina birth certificate, a Federal Aviation Administration pilot's certificate, and other documents in the name of Sam Blakely. Mr. Smith was also carrying $ 1,500 in cash and a satellite pager. Shortly afterwards, Mrs. Smith was arrested. She initially identified herself as Shauna Hills. A vehicle registration document in the name of Laura Judge, a New Mexico driver's license in the name of Shauna Judge, and a Utah birth certificate in the name of Shauna Hills were seized from the Volkswagen she was driving at the time of her arrest. On October 24, 1987, a search warrant *104 was issued for petitioners' residence at 624 Mitchell, Klamath Falls, Oregon. The purpose of the search was to determine the aliases used by petitioners and, more specifically, to find identification documents that would prove the identity or identities used by petitioners in violation of various Federal laws. The residence had been under surveillance for 20 days prior to the search. On October 24 and 25, 1987, a search was conducted at the residence. Among the items seized in the residence were various guns, a prosthetic device (an artificial leg), and identification documents. Mr. Smith wore an artificial leg. The names on the identification documents were L. W. Chester, Samuel Blake, L. W. Chestnut, Robert Burke, James Price, Charles Court, Gerald Olsen, Barrymore Rockefeller III, Eric Charles Crouter, William Crane, George Pasqual, Mary Kay Adams, and Todd Baker. Receipts and utility bills were seized bearing the names Shauna Hills, Shauna Judge, Mary Kay Adams, Laurie Judge, Connie Chester, Rae Ann Judge, and Alex Meyers. Also seized in the search was $ 5,000 in cash found in a garment bag, a box of floppy disks, and a computer. Ben Mahoney (Mahoney), a United States *105 marshal, was the supervising officer in the search of the residence. Mahoney was a member of the first group to enter the residence. Mahoney requested that other agents be called to help in the search. Due to the shortage of Federal agents in the geographic area, it was not uncommon to call on other Federal agents to assist in searches. On October 25, 1987, the supervisor of the United States marshals, Brian Levitt, called the Criminal Investigation Division of the Internal Revenue Service to garner assistance for Mahoney and the other agents in executing the search of the residence. Rodney Hageman (Hageman), special agent for the Criminal Investigation Division, responded to that request. Hageman assisted in searches with the United States marshals, the Drug Enforcement Agency, the Federal Bureau of Investigation, the United States Customs Service, and the Secret Service on a regular basis. Hageman read an affidavit submitted with the search warrant prior to assisting in the execution of the search of the residence. The search of the residence was structured; Hageman was assigned particular rooms to search and was at all times under the control of Mahoney. Hageman was searching *106 for items specified in the warrant. Hageman discovered numerous receipts and general financial documents. Mahoney did not seize any documents at the direction of Hageman. Mahoney did, however, make several photocopies of the seized documents for internal record keeping purposes. Mahoney allowed Hageman to view the copies of the seized documents. Hageman selected documents from the copies to form the basis for a jeopardy assessment to be made against petitioners. On November 17, 1987, in the United States District Court for the District of Oregon (the District Court), a grand jury charged (1) petitioners with conspiracy involving false identification documents and making false statements to a Federal agency, the Federal Aviation Administration, all in violation of 18 U.S.C. secs. 371, 1001, and 1028; (2) petitioners with producing and possessing with intent to unlawfully use five or more false identification documents, possessing false identification documents with intent to defraud the United States, and possessing document-making implements with intent to produce a false identification document; (3) petitioners with possession of a sawed-off rifle; (4) Mr. Smith with being *107 an ex-felon in possession of firearms; and (5) Mrs. Smith with harboring Mr. Smith after his escape from a Federal penal institution. Prior to trial in the District Court, Mr. Smith filed a motion to suppress the evidence seized in the search of the residence because he asserted it was illegally obtained in violation of the Fourth Amendment. That motion was denied. The District Court concluded that there was probable cause to support the issuance of the search warrant and that the warrant issued was reasonable in scope. At trial of the criminal case, Mr. Smith moved for reconsideration of the denial of the motion to suppress, asserting that the search was unlawful because the police officers searched a separate unit at 624-1/2 Mitchell without a separate search warrant for that unit. The denial of Mr. Smith's motion to suppress was reaffirmed by the District Court. That court found beyond a reasonable doubt that both petitioners had equal access to the entire residence. In the District Court, Mr. Smith was found guilty of conspiracy in violation of 18 U.S.C. secs. 371, 1001,and 1028 (relating to production of false identification documents); guilty of fraud in connection with *108 identification documents in violation of 18 U.S.C. sec. 1028(1), (3), (4), (5), and (6); and guilty of possession of a sawed-off rifle in violation of 26 U.S.C. secs. 5861 and 5871. Mrs. Smith was found guilty of conspiracy in violation of 18 U.S.C. secs. 371, 1001, and 1028; guilty of fraud in connection with identification documents in violation of 18 U.S.C. sec. 1028(5) and (6); and guilty of willfully harboring and concealing an escapee in violation of 18 U.S.C. sec. 1072. The documents that formed the basis of the deficiencies in these cases all bear aliases found by the District Court beyond a reasonable doubt to have been used by petitioners in the conduct of their affairs during the years in issue. Those documents reveal the transactions described below: During 1983, Mr. Smith made the following expenditures: (1) $ 20,559 for a residence at 624 Mitchell in Klamath Falls, Oregon, acquired in the name of L. W. Chestnut. (2) $ 7,000 for a 1977 Reinell boat and trailer, acquired in the name of Will Chestnut. (3) $ 6,500 for a 1979 Sleekcraft boat and trailer, acquired in the name of Will Chestnut. (4) $ 2,600 for a mink jacket, acquired in the name of Harold Judge.
*109 During 1984, Mr. Smith made the following expenditures: (1) $ 7,500 for a 1971 Fruehauf trailer, acquired in the name of L. W. Chestnut. (2) $ 406 for a 7-foot boat, paid in the name of L. W. Chestnut.
During 1985, Mr. Smith made the following expenditures: (1) $ 20,000 for a Scheepswerf boat, acquired in the name of L. W. Chestnut. (2) $ 583.23 for repairs to the Scheepswerf boat. (3) $ 8,250 for a 1983 Ford truck, acquired in the name of Sam Blake Farms. (4) $ 2,000 for a diamond ring, acquired in the name of Mr. Crouter. (5) $ 55 for a title certification, paid in the name of L. W. Chestnut.
During 1986, Mr. Smith made the following expenditures: (1) $ 19,000 for a Cessna 310L airplane, acquired in the name of Global Aircraft Recovery Source, Todd Baker. (2) $ 5,367.99 for repairs to a Douglas DC-7 airplane. (3) $ 1,563 in transportation expenses for the Scheepswerf boat, paid in the name of Mr. Chestnut.
During 1987, Mr. Smith made the following expenditures: (1) $ 1,732.83 for repairs to a 1981 Toyota truck. (2) $ 517.28 for Ford truck repairs, paid in the name of Will Chestnut. (3) $ 430 for aircraft tires and tubes, paid in the name *110 of Rick Baker. (4) $ 18,000 of the purchase price of a Cessna 337G airplane.
During 1983, Mrs. Smith made the following expenditures: (1) payments on a loan to West Georgia National Bank totalling $ 3,840.21 and paid the balance due on a loan to West Georgia National Bank by paying the amount of $ 9,071.15. (2) $ 6,500 for a 1982 Volkswagen, acquired in the name of Laura Judge.
During 1984, Mrs. Smith made the following expenditure: (1) $ 318.90 for repairs to a Volkswagen. Two hundred dollars of those repairs was paid was paid in the name of Chestnut Farms; $ 118.90 was paid in the name of S. R. Judge.
During 1985, Mrs. Smith made the following expenditures: (1) $ 13,500 for a DeLorean automobile, acquired in the name of Rae Ann Judge. (2) $ 87.73 for repairs to a Volkswagen, paid in the name of Laurie Judge.
During 1986, Mrs. Smith made the following expenditures: (1) $ 400.36 for repairs to a Volkswagen, paid in the name of Laura Judge. (2) $ 118 for repairs to a DeLorean, paid in the name of Laura Judge.
During 1987, Mrs. Smith made the following expenditures: (1) $ 33.60 for repairs to a Volkswagen, paid in the name of Shana Judge. *111 (2) $ 5,500 for a Cessna 337G airplane, acquired using the name Shauna Hills.
In addition to those amounts expended as set forth above, petitioners each expended for basic living expenses at least $ 5,494.50 in 1983, $ 5,719.00 in 1984, $ 5,889.50 in 1985, $ 5,944.00 in 1986, and $ 6,143.50 in 1987. The purchase price of the residence and most of the other expenditures made by petitioners during the years in issue were made in cash or cash equivalents. On September 12, 1977, the Internal Revenue Service issued to Mr. Smith a refund for the tax year 1971 in the amount of $ 26,505.02 and interest in the amount of $ 5,542.51. On October 24, 1987, petitioners each had cash on hand in the amount of $ 3,250. In 1983, Mrs. Smith submitted a financial aid application to the State of Georgia for her son Charles Smith. On that application, Mrs. Smith stated that in 1982 she had total assets of $ 350 in cash on hand. Neither petitioner filed Federal income tax returns for any year from 1983 through 1987. OPINION Motion to Suppress
At trial of these cases, petitioners moved to suppress all of the evidence seized during the search of the residence. Petitioners argue that (1) *112 Hageman did not have the proper authority to assist in the execution of the search; (2) Hageman needed a separate warrant to search for evidence of violations of Federal income tax laws; and (3) Hageman performed an illegal general sweeping search violating the principles espoused in United States v. Spilotro, 800 F.2d 959 (9th Cir. 1986). Respondent contends that (1) collateral estoppel or res judicata establishes that the search of the residence was proper; (2) petitioners failed to establish that the warrant was issued without probable cause; (3) Hageman had authority to conduct the search; and (4) Mr. Smith had no privacy right that was violated by the search. Because we agree with certain of respondent's arguments, we need not address them all. Collateral Estoppel
The Supreme Court stated in Commissioner v. Sunnen, 333 U.S. 591, 597-598, 92 L. Ed. 898, 68 S. Ct. 715 (1948): But where the second action between the same parties is upon a different cause or demand, the principle of res judicata is applied much more narrowly. In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and *113 determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." Cromwell v. County of Sac, supra, 353. * * * Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, res judicata is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. See Restatement of the Law of Judgments, Secs. 68, 69, 70; Scott, "Collateral Estoppel by Judgment," 56 Harv.L.Rev. 1.
In order to determine the applicability of collateral estoppel in a given case, the Supreme Court articulated a three-prong test in Montana v. United States, 440 U.S. 147, 155, 59 L. Ed. 2d 210, 99 S. Ct. 970 (1979), as follows: first, whether the issues *114 presented by this litigation are in substance the same as those resolved [in the prior litigation]; second, whether controlling facts or legal principles have changed significantly since the [prior] judgment; and finally, whether other special circumstances warrant an exception to the normal rules of preclusion.
See also Meier v. Commissioner, 91 T.C. 273, 283 (1988); Estate of Best v. Commissioner, 76 T.C. 122, 134 (1981). The search warrant issued for the search of petitioners' residence was declared valid by the District Court in the prior criminal proceeding. That court found that the warrant was issued with probable cause and that the items seized were within the scope of the warrant. The purpose of the search of the residence was to find identification documents that would prove the identity or identities used by petitioners. The documents seized by Mahoney that form the basis for the statutory notices in these cases were all "information documents" bearing the aliases used by petitioners. Accordingly, we conclude that petitioners are barred by collateral estoppel to challenge further in this proceeding the issuance or scope *115 of the warrant. See Estate of Best v. Commissioner, 76 T.C. at 141. Petitioners also complain of a general sweeping search. In United States v. Spilotro, 800 F.2d 959 (9th Cir. 1986), the Court of Appeals for the Ninth Circuit concluded that a warrant there under examination did not describe the items to be seized with sufficient particularity to withstand Fourth Amendment scrutiny and, accordingly, suppressed the items seized. Here the District Court concluded in the prior criminal proceeding that the items seized in the search of the residence were within the scope of the warrant. Hageman testified that he read a search warrant affidavit prior to assisting in the search of the residence and that he performed the search pursuant to specifically assigned division of responsibility. We have no reason to reject this testimony. Collateral estoppel is not, however, applicable to petitioners' claim that the presence of the Internal Revenue agent violated his Fourth Amendment rights against unlawful search and seizure. There is no evidence that petitioners argued in the prior criminal proceeding that the presence of Hageman in the search of *116 the residence violated their Fourth Amendment rights or that Hageman's presence was relevant to the issues in the criminal case. See Commissioner v. Sunnen, 333 U.S. at 597-598. The Presence of the Revenue Agent
Petitioners challenge the authority of Hageman to participate in the search of the residence. 18 U.S.C. sec. 3105 provides that: A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.
That provision has been construed to allow Federal officers not named in a warrant to assist in executing a Federal search warrant. United States v. Hare, 589 F.2d 1291, 1297 (6th Cir. 1979); In re Southeastern Equipment Co. Search Warrant, 746 F. Supp. 1563, 1577 (S.D.Ga. 1990). Mahoney testified that he enlisted the aid of Hageman because the search of the residence was detailed and extra personnel were needed. Mahoney was authorized to execute the warrant. Accordingly, Mahoney had the power, under *117 18 U.S.C. sec. 3105, to utilize the assistance of other officers in the execution of the warrant, provided Mahoney was present and participating in the execution of the warrant. Thus petitioners' Fourth Amendment rights were not violated by Hageman's presence during the search of the premises. Petitioners have not proven any illegality or cited any authority that would justify suppression of evidence in this case. Petitioners' motion to suppress will be denied. Unreported Income
*118 Respondent used an indirect method, the cash expenditures method of proof, to reconstruct petitioners' respective income tax liabilities, and respondent used Bureau of Labor statistical data to estimate petitioners' expenses. Sec. 446(b); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965). The cash expenditures method is based on the assumption that, absent an explanation to the contrary, the excess of a taxpayer's expenditures over reported income represents taxable income. Burgo v. Commissioner, 69 T.C. 729, 742 (1978). Respondent's use of the cash expenditures method is justified. Nicholas v. Commissioner, 70 T.C. 1057, 1065 (1978). Respondent's use of statistical data to estimate petitioners' expenses during the years in issue is also permissible. Burgo v. Commissioner, supra.
Respondent used the receipts lawfully seized in the search of the residence to form the basis for his reconstruction of petitioners' income. Petitioners bear the burden of proving that respondent's method of reconstructing income is incorrect. Rule 142(a). Petitioners contend that Mrs. Smith (1) was not employed during the years in issue but, rather, relied on lifelong friends for her financial support; (2) had a $ 28,000 cash hoard consisting solely of a 1977 refund from the Internal Revenue Service; and (3) had $ 40,000 that she kept in a drawer from the sale of a residence in Georgia in 1983. Petitioners contend that Mr. Smith was a fugitive on escape from a Federal penitentiary during the years in issue and he relied on Mrs. Smith and friends for financial support. Finally, petitioners contend that Todd Baker was responsible for some of the expenditures used as the basis for respondent's determination. Petitioners' assertion that Mrs. Smith had a $ 28,000 cash hoard and that petitioners lived on that amount *119 during the years in issue is implausible. Mr. Smith did receive a refund of $ 26,505.02 and interest in the amount of $ 5,542.51 in connection with his 1971 tax liability. That refund was paid on September 12, 1977. There is no evidence, however, that Mrs. Smith received any of that amount. In any event, we do not believe that either petitioner received over $ 32,000 in 1977 and retained $ 28,000 of that amount for the next 6 years. Mr. Smith's expenditures on legal fees alone in 1981 were in excess of $ 20,000. Petitioners testified with respect to their individual expenditures during the years in issue. Mr. Smith testified that he was unaware of any of the expenditures itemized by respondent in respondent's requests for admissions except his purchase of a Livingston fishing boat, Mrs. Smith's purchase of a Volkswagen for $ 6,500, and the purchase of the residence. With respect to the purchase of a Cessna 310 aircraft, Mr. Smith testified that: We have an aircraft here, Cessna 310 aircraft for 1986. I don't know anything about it, Your Honor. I -- that's -- that's not quite true. I do know something about the airplane. I know that a fellow by the name of Todd Baker *120 bought that airplane, and I'm -- he bought a 310 about that time. * * *
Mr. Smith similarly asserted that Todd Baker was a partner of his in the purchase of another airplane. In the criminal proceeding, the District Court concluded beyond a reasonable doubt that petitioners produced false identification documents using the name, among others, of Todd Baker. Petitioners are collaterally estopped to deny that Todd Baker was an alias of Mr. Smith. See Meier v. Commissioner, 91 T.C. at 286. In any event, we have no reliable evidence to the contrary, and we are not persuaded that a person other than Mr. Smith made any of the purchases attributed by respondent to Mr. Smith. Mrs. Smith testified reluctantly and only when respondent called her as a witness for the purpose of showing that testimony by Mrs. Smith in the criminal case conflicted with petitioners' claims in this case. Her testimony consisted of guesses. She did confirm that Mr. Smith acquired their residence under the name L. W. Chester "because he knows how to buy things. I don't." Petitioners claim that Mrs. Smith sold a residence in Georgia in 1983 and thereafter lived on $ 40,000 received *121 from the sale. Mrs. Smith did not list $ 40,000 in proceeds from the sale of a Georgia residence or list any residence as an asset on a 1983 financial aid from for her son, Charles Smith, that she submitted to the State of Georgia. Finally, Mrs. Smith offered no credible evidence, just a general assertion, that she received her support for the years 1983 through 1987 from family and friends. Not a single witness was called to corroborate this claim. Rather, Mrs. Smith testified that during that same period she purchased a DeLorean for $ 13,500 and a Volkswagen for $ 6,500. She also stated that she paid $ 5,500 to purchase a Cessna airplane "and it was given back to me, too." Petitioners have not proven that they lived during the years in issue on cash accumulated prior to those years. Petitioners' testimony on the expenditures they made is inconsistent with the evidence in the record and does not overcome the admitted facts. Petitioners' explanations are not credible; they have not sustained their burden of proving that respondent's determination is incorrect. Addition to Tax for Fraud
Section 6653(b)(1), in effect for 1983, 1984, and 1985, provides for an addition to *122 tax of 50 percent of the underpayment if any part of any underpayment of tax required to be shown on a return is due to fraud. Section 6653(b)(1)(A), in effect for 1986 and 1987, provides for an addition to tax of 75 percent of the portion of the underpayment attributable to fraud if any part of any underpayment of tax required to be shown on a return is due to fraud. Section 6653(b)(2) and section 6653(b)(1)(B) provide for an addition to tax of 50 percent of the interest payable under section 6601 (relating to interest on underpayments) with respect to the portion of the underpayment attributable to fraud. The additions to tax in the case of fraud are a civil sanction provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expenses of investigation and the loss resulting from the taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401, 82 L. Ed. 917, 58 S. Ct. 630 (1938). Respondent has the burden of proving, by clear and convincing evidence, an underpayment and that some part of the underpayment for each year is due to fraud. Sec. 7454(a); Rule 142(b). This burden is met if it is shown that the taxpayer intended to evade *123 taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud will never be presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Facts deemed admitted may establish fraud. Doncaster v. Commissioner, 77 T.C. 334, 336 (1981). Underpayment
To satisfy his burden of proof, respondent must initially prove that an underpayment exists. Respondent has prevailed on the issue of the existence of deficiencies by virtue of petitioners' failure to satisfy their burden of proof and to contradict the admitted facts. Respondent, however, may not rely on petitioners' failure alone to satisfy his burden of proof. Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989). *124 Rather, as we stated in Parks v. Commissioner, 94 T.C. 654, 661 (1990): Respondent can satisfy his burden of proving the first prong of the fraud test, i.e., an underpayment, when the allegations of fraud are intertwined with unreported and indirectly reconstructed income in one of two ways. Respondent may prove an underpayment by proving a likely source of the unreported income. Alternatively, where the taxpayer alleges a nontaxable source, respondent may satisfy his burden by disproving the nontaxable source so alleged. [Citations omitted.]
Respondent contends that petitioners' likely source of income was drug smuggling for 1983 through 1987 and theft for 1983. Respondent contends that the following indicate that drug smuggling was a likely source of petitioners' income: (1) Mr. Smith's previous criminal conviction for transporting marijuana; (2) the amount Mr. Smith expended for repairs to airplanes; (3) that Mr. Smith was carrying a beeper when he was arrested; (4) the testimony of Brown that he paid Mr. Smith $ 40,000 for the purchase of an airplane; (5) the testimony of Brown that Mrs. Smith transported Mr. Smith to a meeting with Brown where *125 Brown and Mr. Smith discussed the purchase of an airplane for use in transporting illegal drugs; (6) that Mr. Smith agreed to an ongoing arrangement with Brown for transporting drugs; (7) that Mrs. Smith paid part of the purchase price of a Cessna 337G; (8) that Mrs. Smith harbored Mr. Smith; and (9) that: Petitioners' involvement in drug smuggling is also evidenced by the numerous aliases they used during the years at issue. Drug smugglers frequently use multiple alias [sic]. * * * Had petitioners only wished to avoid * * * capture, one alias consistently used by each of them would have been sufficient.
Alternatively, respondent contends that Mr. Smith's likely source of income was from stealing a drug shipment from Brown. Respondent asserts that, based on the testimony of Brown, at a minimum Mr. Smith could have received $ 225,000 for the purportedly stolen shipment. Respondent relies almost exclusively on the testimony of Brown, a convicted drug smuggler and dealer, to support allegations of drug dealing. As in other cases, the only direct evidence of illegal activity comes from an alleged cohort in crime. Although we believe from the evidence that Mr. Smith received *126 income from illegal activities, our decision does not rest on that ground. As we stated in Parks: Thus in order to satisfy his burden of proving an underpayment respondent must disprove petitioner's allegation of a cash hoard * * *. Respondent may disprove that alleged specific nontaxable source of income through showing that his reconstruction of income is accurate combined with a showing that petitioner's allegation of a cash hoard is inconsistent, implausible, and not supported by objective evidence in the record. * * * [Parks v. Commissioner, 94 T.C. at 661.]
We have concluded that respondent's reconstruction of petitioners' income is valid. We have further concluded that petitioners' explanations of their available cash during the years in issue are implausible. Petitioners' assertion of a cash hoard is incredible, inconsistent, and not supported by evidence in the record. Respondent has met his burden of proving an underpayment by clear and convincing evidence. See Parks v. Commissioner, 94 T.C. at 661. Fraudulent Intent
Respondent must also, however, prove by clear and convincing evidence that petitioners *127 had the requisite fraudulent intent. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, 317 U.S. 492, 499, 87 L. Ed. 418, 63 S. Ct. 364 (1943). A pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See Holland v. United States, 348 U.S. 121, 137, 99 L. Ed. 150, 75 S. Ct. 127 (1954); Otsuki v. Commissioner, 53 T.C. 96 (1969). However, the mere failure to report income is not sufficient to establish fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962). Indicia of fraud that may be taken into account include understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, and the concealment of assets. Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. a Memorandum Opinion of this Court. A further indication of fraud is "handling of one's affairs to avoid making the records usual in transactions of the kind." Spies v. United States, 317 U.S. at 499; see also *128 Ruark v. Commissioner, 449 F.2d 311, 313 (9th Cir. 1971). The extensive use of cash is one such method of handling one's affairs that is indicative of fraud. Gromacki v. Commissioner, 361 F.2d 727, 731 (1966). Mr. Smith was a fugitive during the years in issue. He did not file Federal income tax returns, and we have concluded that his explanations of the sources of his income are implausible. Mrs. Smith similarly failed to file Federal income tax returns for the years in issue and offered equally implausible explanations of her sources of income. Both petitioners used false names to conduct their affairs during the years in issue and made many of their expenditures in cash or cash equivalents. Respondent has proven fraudulent intent on the part of both petitioners. Conclusion
Respondent's determination of unreported income and allocations of expenditures made by the individual petitioners is sustained. Petitioners are liable for the additions to tax for fraud for each of the years in issue. The section 6654(a) additions to tax for failure to pay estimated tax are mandatory absent reasonable cause or other exceptions not present here. Sec. 6654(e)(3)(B)(ii); *129 Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980). To reflect the foregoing and concessions by the parties,
Decisions will be entered under Rule 155. Footnotes
*. 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment attributable to fraud.↩