**UNITED STATES of America, Plaintiff,**

**v.**

**Lamar Duran BAKER, Defendant.**

**Crim. No. 95–00416–01 DAE.**

United States District Court,
D. Hawai'i.

June 16, 1995.

---

Wayne H. Tashima, Honolulu, HI, for defendant.

Edward Kubo, Jr., U.S. Attys. Office, Honolulu, HI, Daniel C. Stark, U.S. Dept. of Justice, Crim. Div., Washington, DC, for U.S.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

DAVID ALAN EZRA, District Judge.

The court heard Defendant's motions on June 13, 1995. Wayne H. Tashima, Esq.,

appeared on behalf of Defendant. Assistant United States Attorney Edward Kubo and Department of Justice Attorney Daniel C. Stark, appeared on behalf of Plaintiff. After reviewing the motions and the supporting and opposing memoranda, the court DENIES Defendant's Motion to Suppress Evidence and DENIES in part and GRANTS in part Defendant's Motion to Suppress Statements.

### BACKGROUND

Defendant Lamar Duran Baker ("Baker") moves this court to suppress all evidence seized pursuant to four search warrants issued in the instant case, and to suppress statements made by Defendant after arrest but before arraignment. Defendant's Motion to Suppress Evidence rests on three separate grounds: (1) no probable cause supporting the issuance of the search warrants; (2) stale evidence in support of the search warrants; and (3) items were seized beyond the scope of the search warrants. Defendant's Motion to Suppress Statements is also based on three grounds: (1) failure to take Defendant promptly before a magistrate without unnecessary delay renders the statements inadmissible; (2) neither statement was made within six hours following Defendant's arrest as required by 18 U.S.C. § 3501(c) and are thus inadmissible; and (3) the statements were taken in violation of Defendant's *Miranda* rights.

On April 13, 1995, a grand jury indicted Baker and Tracy Freeman–Mueck ("Freeman–Mueck"), charging them with conspiring to transport, inducing to be transported, and knowingly transporting an alien under the age of 18 years from Vancouver, British Columbia, Canada to the States of Washington and Hawaii, with intent that the alien engage in prostitution in violation of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. §§ 2421, 2422, and 2423(a) (prostitution), and 8 U.S.C. §§ 1324(a)(1)(B) and 1324(a)(1)(D) (alien).

The affidavit in support of the search warrants, submitted by Special Agent Robert A. Murphy of the United States Border Patrol Anti–Smuggling Unit, contained the following information.

Special Agent Murphy personally interviewed "K.M.," the 17–year–old female Canadian citizen allegedly brought to Hawaii by Baker and Freeman–Mueck. K.M. states she was a prostitute in Vancouver, British Columbia, Canada in August 1993 when she met Tracy Freeman–Mueck, who put K.M. into contact with Baker in Hawaii. After informing Baker she was 17, Baker told K.M. he wanted her to come "work" for him as a prostitute in Hawaii. K.M. soon moved in with Freeman–Mueck and began giving all her prostitution monies to Freeman–Mueck, who wired the money to Baker in Hawaii. On September 1, 1993, Freeman–Mueck instructed K.M. to go with another person and cross the international border into the State of Washington. On September 2, 1993, K.M. flew to Hawaii from Washington at Baker's instruction, using money wired by Baker in Honolulu to K.M. in Washington. Special Agent Murphy obtained Hawaiian Airlines records confirming K.M.'s flight, which indicate that the reservation was made in Honolulu, Hawaii.

K.M. claims that she worked as a prostitute for Baker in Waikiki during September and October 1993. K.M. admitted that while "working" in Hawaii she and another prostitute stole a Rolex watch from the hotel bathroom of a Japanese tourist at the Outrigger Prince Hotel in Waikiki, and that they gave the watch to Baker. She described the watch as having rubies and diamonds surrounding the face. A police theft report was filed on October 10, 1993, by a Tomio Sasaki which accurately corroborated K.M.'s account.

According to K.M., she left Hawaii on November 1, 1993, but left several items, mostly clothes and accessories, in the apartment she shared with another prostitute, allegedly rented by Baker.

Special Agent Murphy spoke to Detective Randy Peterson of the Vancouver Police Department, a police expert in courts of Canada in the area of prostitute/pimp relationships, cultures and customs. According to Detective Peterson, a group of prostitutes and their pimp is known as a "family." Items such as clothes and belongings are considered the pimp's property and are kept by the

pimp to be shared among his prostitutes. In Detective Peterson's expert opinion, items left behind by K.M. in 1993 would still be used by Baker's family of prostitutes in 1995.

Detective Peterson personally met Baker around April, 1993 in the course of his intelligence-gathering vice duties in Vancouver, Canada. Detective Peterson alleges that Baker admitted to him that he was a pimp, and that he had a number of prostitutes working for him in Vancouver, one of whom he identified as Freeman–Mueck. Police intelligence in Honolulu also identifies Baker as a renown pimp, with anywhere from 3 to 6 prostitutes working for him in the Waikiki area since at least 1993.

K.M. stated that Baker lived at the Nauru Towers in Honolulu. Rental documents reviewed by Special Agent Murphy confirmed Baker has been renting an apartment at Nauru Towers since 1993.[1] Special Agent Murphy also reviewed rental documents for an apartment Baker has been renting on South Street[2] since September, 1994, allegedly for his prostitutes' use. A Jaguar (California License No. 3DJU760) owned by Baker was seen parked in front of both addresses several times during surveillance operations in April 1995, and Baker was taken into custody while in the vehicle.

Baker was arrested at approximately 4:15 p.m. on Friday, April 14, 1995, pursuant to a grand jury indictment issued on Thursday, April 13, 1995. He was then interviewed twice before his arraignment the following Monday. The government asserts that Baker was orally given his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at the time of his arrest and at the time of his first and second interviews. The government further asserts that Baker stated that he understood his rights, and that he made voluntary oral waivers of his rights each time they were read to him. No written, signed waivers exist. At the pre-trial hearing Baker admitted receiving and understanding his rights at the time of his arrest, but denied having been re-*Mirandized.*

The first interview commenced at about 12:05 a.m. on Saturday, April 15, 1995, approximately eight (8) hours after Baker's arrest. During this session Baker generally denied being a pimp and taking money from prostitutes, but made some factual admissions connecting him to certain alleged prostitutes.

After the first interview ended, Baker asked to speak privately with Detective Peterson, the Canadian officer assisting with the operation. Notes taken by Detective Peterson soon after they spoke reveal that at the end of their conversation Baker told Peterson "he wanted to speak with a lawyer and read his full indictment to see where he stood." *See* Peterson notes at 4. This request to Peterson was not relayed to United States Agents.

The second interview commenced at about 11:10 a.m. on Sunday, April 16, 1995, more than 42 hours after Baker's arrest. During this session Baker made several statements regarding his awareness of recent surveillance of him by law enforcement agents, his familiarity with the pimping community in Waikiki, his past bribery of law enforcement agents, his access to information about police activities, and his ability to buy large quantities of drugs and give information to agents regarding an "escort service" and "dirty" law enforcement officers.

Baker was arraigned on Monday, April 17, 1995.

### DISCUSSION

I. Motion to Suppress Evidence

A. *Probable Cause for Issuance of Search Warrants*

 In evaluating the sufficiency of an affidavit for a search warrant, a magistrate need only have a "substantial basis" for concluding that probable cause existed based on the totality of the circumstances. *Massachusetts v. Upton,* 466 U.S. 727, 732, 104 S.Ct. 2085, 2087, 80 L.Ed.2d 721 (1984); *Greenstreet v. County of San Bernardino,* 41 F.3d 1306, 1308 (9th Cir.1994); *United States v.*

---

**1.** Located at 1330 Ala Moana Blvd., Apt. 906.

**2.** Located at 425 South Street, Apt. 2602.

*Bertrand,* 926 F.2d 838, 841 (9th Cir.1991). "[T]he affidavit must be read as a whole and given a common sense and realistic interpretation." *United States v. Traylor,* 656 F.2d 1326, 1330 (9th Cir.1981). Finally, a magistrate's determination of probable cause supporting the issuance of a search warrant is to be accorded great deference, and should be reversed only where clearly erroneous. *United States v. Schmidt,* 947 F.2d 362, 371 (9th Cir.1991); *United States v. Terry,* 911 F.2d 272, 275 (9th Cir.1990).

■ Applying these standards to the facts in the instant case, the court easily finds that there was sufficient evidence to provide a "substantial basis" for the magistrates' findings of probable cause supporting the issuance of the search warrants.

The affidavit contains details about how K.M. agreed to come to Hawaii to prostitute for Baker; how he arranged and paid for her transport to Hawaii; and how she prostituted for him while in Hawaii. Viewed in conjunction with statements by law enforcement agents that Baker's prostitution activities are notorious and ongoing, and in light of corroborating documentary evidence, a "substantial basis" for the magistrates' probable cause determinations is evident.

Moreover, the specificity of the items K.M. left behind, and Detective Peterson's expert opinion that such items would still be in use by the Baker's "family" of prostitutes, also support the magistrates' probable cause determinations.

■ A magistrate may consider hearsay statements in an affidavit in determining probable cause. *United States v. Castillo,* 866 F.2d 1071, 1077 (9th Cir.1988). The affidavit must provide facts showing the veracity of the declarant and the reliability of the information, so that it appears "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); *see also*

*United States v. Calabrese,* 825 F.2d 1342, 1348 (9th Cir.1987). The information K.M. related to Special Agent Murphy was firsthand, and was corroborated by significant documentary evidence such as rental agreements, airline reservations, police reports, as well as by other informants' and agencies' information.[3] As such, K.M.'s credibility and the information's reliability were sufficiently substantiated.

**B.** *Staleness of Evidence Supporting Search Warrants*

■ The mere lapse of a substantial amount of time between the alleged facts establishing probable cause and the application for a search warrant does not control the issue of staleness. *United States v. Pitts,* 6 F.3d 1366, 1369 (9th Cir.1993). A search warrant is not stale where "there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir.1986). "[S]taleness must be evaluated in light of the particular facts of the case and nature of the criminal activity and property sought." *United States v. Greany,* 929 F.2d 523, 525 (9th Cir.1991).

■ In the instant case, there was sufficient basis to believe that the items listed in the search warrants would be at the locations specified when the warrants were issued. Based on Detective Peterson's expert opinion that personal items are considered a pimp's property and are communally used by the pimp's "family" of prostitutes, it appeared very likely that the clothing and accessories K.M. left behind 18 months ago would be found at locations currently frequented by Baker and his alleged prostitutes.

In addition, Special Agent Murphy's affidavit carefully established the continuous nature of Baker's pimping activities. Recent police surveillance in Waikiki confirmed that up until the night of his arrest and just before the issuance of the search warrants,

**3.** The Ninth Circuit has found that where independent police or expert investigators corroborate the information provided by an informant, probable cause is shown. *United States v. Bertrand,* 926 F.2d 838, 841 n. 6 (9th Cir.1991). Considering the statements made by other agents corroborating K.M.'s information and the additional documentary evidence discovered by Special Agent Murphy in the course of his investigation, the magistrates' determinations are particularly sound.

Baker was seen talking to women believed by local authorities to be his prostitutes in Waikiki, and suspected prostitutes were seen coming and going from his South Street apartment at irregular hours. Where such an ongoing operation is shown, "staleness arguments lose much of their force." *United States v. Hernandez–Escarsega*, 886 F.2d 1560, 1566 (9th Cir.1989); *see also United States v. Landis*, 726 F.2d 540, 542 (9th Cir.1984) (continuous nature of the activity diminishes the significance of the time lag between the acts described in the affidavit and the presentation of the affidavit to the magistrate).

In *United States v. Greany*, a statement by an informant that he had performed remodeling work at defendant's residence two years earlier to allow defendant to grow marijuana on the second floor was not stale according to the Ninth Circuit, because the magistrate could have reasonably concluded that evidence of marijuana growing would still be present. 929 F.2d 523, 525 (9th Cir. 1991). In the instant case there was similar expert testimony substantiating the magistrates' conclusions that evidence would still be present at the locations specified. In addition, extremely recent surveillance information suggesting the ongoing nature of the prostitution operation further nullifies Defendant's staleness argument.

The court finds that no issue as to staleness exists regarding the evidence offered in support of the magistrates' determinations that there was probable cause for the issuance of the search warrants.

### C. *Violation of Scope of Search Warrants*

▪ Any items recovered in the searches which were not specifically enumerated in the search warrants are admissible through application of the common law "plain view" test.

▪ To deem an item legally seized under the plain view test, three factors must be satisfied: (1) an officer must be in a lawful position to view the item; (2) the item must reasonably appear to be contraband or evidence of a crime; and (3) the discovery must be inadvertent. *Texas v. Brown*, 460 U.S. 730, 737, 103 S.Ct. 1535, 1541, 75 L.Ed.2d 502 (1983); *United States v. Washington*, 797 F.2d 1461, 1468 (9th Cir.1986).

In the instant case, the agents had valid search warrants allowing them to lawfully view all items in Defendant's apartments, storage locker, and automobile, thereby satisfying the first factor of the plain view test.

▪ Regarding the other two considerations under the plain view test, at this time the court has no evidentiary basis from which to determine the admissibility of specific items as listed on the returns of the searches. Defendant made the bare, conclusory allegation in his Motion to Suppress that the searches were overbroad.[4] However, neither in his Motion to Suppress nor in his Memorandum of Points and Authorities did Defendant specifically indicate which items he was objecting to or why they were alleged to be outside the scope of the warrants.[5] At the suppression hearing Defendant's counsel made no indication or argument whatsoever, but merely rested on his moving papers. The court therefore defers any determination regarding possible admission of items seized until trial, pursuant to Fed.R.Crim.P. 12(e),[6]

---

**4.** The Ninth Circuit has held that where a defendant's moving papers are conclusory and conjectural a district court would not abuse its discretion in denying defendant's request for an evidentiary hearing outright. *See United States v. Wilson*, 7 F.3d 828 (9th Cir.1993); *see also United States v. Ayers*, 924 F.2d 1468 (9th Cir.1991).

**5.** In fact, Defendant in his Memorandum of Points and Authorities did not even address the issue of overbroad searches, which he raised in his Motion to Suppress, but rather argued the overbreadth of the warrants, a completely new issue.

**6.** Rule 12(e) provides:

> **Ruling on motion.** A motion made before trial shall be determined before trial unless the court, for good cause, orders that it be deferred for determination at the trial of the general issue or until after verdict, but no such determination shall be deferred if a party's right to appeal is adversely affected. Where factual issues are involved in determining a motion, the court shall state its essential findings on the record.

Fed.R.Crim.P. 12(e).

so that an evidentiary basis can be established.

■ However, even if an overbroad search were shown by Defendant as to specific items (i.e., unenumerated items were seized for which the plain view test is not satisfied), the admissibility of items that were properly seized would not be affected. Only items unjustifiably seized outside the scope of a search warrant are excised; contemporaneously seized items which do fall within the legitimate scope of a search warrant remain admissible and unaffected by any impermissible seizures. *United States v. Whitten,* 706 F.2d 1000, 1010 (9th Cir.1983) (citing *United States v. Heldt,* 668 F.2d 1238, 1259 (D.C.Cir. 1981)).

### D. *Overbreadth of Search Warrants*

■ Defendant's Motion to Suppress Evidence alleged the seizure of items beyond the scope of the terms of the search warrants. However, in his Memorandum of Points of Authorities Defendant makes the new and different claim that the warrants themselves were overbroad in their description of items to be seized. Defendant's Memorandum of Points and Authorities in Support of Motion to Suppress Evidence, at 6–8. Defendant's new overbreadth argument fails under the facts of this case.

Defendant cites *United States v. Spilotro* for the applicable test in determining whether a description in a search warrant is sufficiently precise. *United States v. Spilotro,* 800 F.2d 959 (9th Cir.1986). According to *Spilotro,* one or more of the following factors is to be considered in determining sufficient precision in a search warrant description: (1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether

the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued.[7] *Spilotro,* 800 F.2d at 963.

In *Spilotro,* the warrants at issue were extremely vague, authorizing the seizure of "... notebooks, notes, documents, address books, and other records ... which are or may be: (1) property that constitutes evidence of the commission of a criminal offense; or (2) contraband ...; or (3) property designed or intended for use or which is or has been used as the means of committing a criminal offense." 800 F.2d at 961. The Ninth Circuit found such a vague description unconstitutionally broad under the articulated three-part standard.

The search warrants in the instant case provide for significantly more specificity than the warrants in *Spilotro* and therefore survive the *Spilotro* standard. Specific items of clothing are listed in the search warrants, as are items of jewelry, specific types of receipts, bills, and rental agreements, as well as other narrowly tailored categories of items that would likely have a direct nexus with the crimes charged in the indictment.

Accordingly, the court finds that because (1) probable cause existed for all listed items, (2) the warrants listed the items to be seized with sufficient specificity as to constitute an "objective standard" for the executing officers, and (3) the government was not able to describe the items with more particularity in light of the information available at the time the warrants were issued, the search warrants satisfy the *Spilotro* test and therefore were not overbroad.[8]

### E. *Failure to Attach Affidavit to Search Warrants*

■ Both parties have stipulated that none of the search warrants had a copy of the affidavit physically attached at the time

---

**7.** "The government is not required to list the items in ... elaborate detail...." *United States v. Schmidt,* 947 F.2d 362 (9th Cir.1991).

**8.** Defendant further argues that the search warrants failed to describe the specific crimes suspected of having been violated, failed to implicate federal law, and did not expressly refer to or

incorporate by reference the affidavit in support of the search warrants. *See* Defendant's Memorandum of Points and Authorities in Support of Motion to Suppress Evidence, at 7. These contentions are all incorrect upon review of the search warrants.

of their execution. The validity of the searches is therefore at issue.

■■■■■ As a threshold matter, there is no constitutional requirement that an affidavit be attached to the warrant at the time of the search. *Sherrick v. Eyman,* 389 F.2d 648, 652 (9th Cir.1968), *cert. denied,* 393 U.S. 874, 89 S.Ct. 167, 21 L.Ed.2d 144 (1969). However, there is a general requirement that the warrant set out objective standards by which the executing officers can differentiate items subject to seizure from those which are not. *United States v. Spilotro,* 800 F.2d 959, 963 (9th Cir.1986). The standards guiding executing officers can be wholly contained within the four corners of the search warrant, or they can be incorporated into the search warrant from the supporting affidavit. *See United States v. Hillyard,* 677 F.2d 1336, 1340 (9th Cir.1982).

In the instant case, the court has already found, in its treatment of Defendant's overbroad claim, that the warrants were sufficiently specific to constitute an "objective standard" for the executing officers. Because the search warrants listed the items to be seized with sufficient specificity so as to adequately guide the executing officers, there was no need to refer to the affidavit for proper execution of the warrants.

■■■■■ Even if the court determined that reference to the supporting affidavit was necessary to cure any overbreadth of the search warrants, failure to physically attach the affidavit to the search warrants would not have proven fatal. The Ninth Circuit has recently reviewed its line of cases dealing with the so-called "cure by affidavit" doctrine, whereby an affidavit's specificity can cure a search warrant's generality. *United States v. Towne,* 997 F.2d 537 (9th Cir.1993). The purpose of the "cure by affidavit" doctrine is to limit the discretion of the executing officers so as to prevent overbroad searches in violation of the Fourth Amendment. *Id.* at 548. Early "cure by affidavit" cases required: (1) that a search warrant expressly incorporate the affidavit by reference; and (2) that the incorporated affidavit "accompany" the warrant. *See, e.g., United States v. Hayes,* 794 F.2d 1348 (9th Cir.1986), *cert. denied,* 479 U.S. 1086, 107 S.Ct. 1289, 94

L.Ed.2d 146 (1987); *Hillyard,* 677 F.2d at 1340; *In re Property Belonging to Talk of the Town Bookstore, Inc.,* 644 F.2d 1317, 1319 (9th Cir.1980). Later cases occasionally changed the "accompany" language to facially state that a supporting affidavit must be "attached" to a search warrant to cure the warrant's generality. *See, e.g., Spilotro,* 800 F.2d at 967; *Center Art Galleries–Hawaii, Inc. v. United States,* 875 F.2d 747, 750 (9th Cir.1989). The Ninth Circuit expressly stated in *Towne,* however, that there is "no indication that this change in terminology was the result of a considered, intentional choice reflecting any sort of judgment as to the superiority of a rule requiring that the affidavit be physically attached to the search warrant. Nor is there any suggestion in [*Spilotro* ] that the shift from "accompany" to "attached" was meant to effect a substantive change in the circuit law." *Towne,* 997 F.2d at 546. The Ninth Circuit underscored its rejection of the "physical attachment" requirement by asserting that no other circuit has ever required physical attachment to satisfy the purpose of the "cure by affidavit" doctrine. *Id.,* at 547 n. 5. The Court even cited, with apparent approval, cases which deemed either only incorporation by reference *or* only mere presence of an affidavit at the location of the search sufficient. *Id.*

The thorough discussion in *Towne* makes it clear that the Ninth Circuit is currently and has always been concerned with the purpose and spirit of the "cure by affidavit" doctrine—to limit officer's discretion in order to ensure sufficiently narrow searches in accord with the Fourth Amendment. "We simply do not believe that the Constitution requires us to draw the line between lawful and unlawful search warrants according to the presence or absence of a staple, a paper clip, a bit of tape, or a rubber band." *Towne,* 997 F.2d at 548.

Accordingly, the court finds that failure to physically attach the affidavits to the search warrants has no effect on the validity of the search warrants or resulting seizures.

### F. *Failure to Show Copy of Search Warrant to Defendant*

■■■■ Baker argues that Special Agent Murphy failed to show him a copy of the

search warrant prior to searching his residence, thus invalidating the search. Special Agent Murphy testified that he asked Baker for permission to search, and when this was denied, he stated that he didn't need Baker's permission because he had a warrant. Baker was not then shown the warrant. However, a copy of the warrant was left in the apartment.

Federal Rule of Criminal Procedure 41(d) states in pertinent part:

> **Execution and Return with Inventory.** The officer taking property under the warrant shall give to the person from whom or from whose premises the property was taken a copy of the warrant and a receipt for the property taken *or* shall leave the copy and receipt at the place from which the property was taken.... The federal magistrate judge shall *upon request* deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

Fed.R.Crim.P. 41(d) (emphasis added).

 The procedures for execution and return of a search warrant contained in Rule 41(d) are ministerial only, and failure to comply with such statutes does not void an otherwise valid search. *United States v. Freitas,* 800 F.2d 1451, 1455 (9th Cir.1986); 2 W. LaFave *Search and Seizure* § 4.12(a) (1987). The rules do not require the officers executing the search to show the warrant to the occupants, or even to have it in their physical possession. Fed.R.Crim.P. 41(d); *see* 1 W. Ringel, *Searches & Seizures Arrests and Confessions,* (1979).

"The Federal Rules of Criminal Procedure [do not] impose an inflexible requirement of prior notice. Rule 41(d) does require federal officers to serve upon the person searched a copy of the warrant and a receipt describing the material obtained, but it does not invariably require that this be done before the search takes place." *Katz v. United States,* 389 U.S. 347, 356 n. 16, 88 S.Ct. 507, 514 n. 16, 19 L.Ed.2d 576 (1967); *United States v. Woodring,* 444 F.2d 749, 751 (9th Cir.1971).

 If a violation of Rule 41(d) is identified, it must be determined whether it is "fundamental or non-fundamental." *United States v. Johns,* 948 F.2d 599, 603 (9th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3046, 120 L.Ed.2d 913 (1992). Fundamental violations are those that are deemed unconstitutional under traditional Fourth Amendment standards. *Id.* at 604. Non-fundamental violations are those which do not arise to the level of constitutional error. Non-fundamental violations require suppression only where there would be prejudice (i.e. the search would not have occurred, or would not have been so intrusive if rule was followed) or where the officers deliberately disregarded a provision of the rule. *Id.; see also United States v. Luk,* 859 F.2d 667, 671 (9th Cir.1988); *Freitas,* 800 F.2d at 1455 (citing *United States v. Stefanson,* 648 F.2d 1231, 1235 (9th Cir.1981) (further citations omitted)).

In this case, the court finds that no violation occurred, because the agents left a copy of the warrant at Baker's residence. However, even if they failed to do so, the violation would only be non-fundamental in nature.

Baker has made no showing of prejudice to him as a result of a failure to give him a copy of the warrant. He has not shown that the search might not have occurred or might have been somehow less intrusive had the warrant been shown to him prior to the search. There was no testimony or allegations whatsoever, that there was an intentional and deliberate disregard of the rule. Moreover, the defense was provided with a copy of the warrant well before trial and made no objection to its form. Accordingly, the court finds that the evidence seized in the search was admissible.

In conclusion, the court finds the magistrates had ample probable cause to issue the search warrants, the facts contained in the affidavit suggested ongoing criminal activity and were thus not stale, and the scope of the search warrants was not violated based on the evidence before the court. Further, the failure to attach the affidavit to the search warrants was inconsequential, and there was no error in failing to show Defendant a copy of the search warrant for his residence upon execution.

Accordingly, the court DENIES Defendant's Motion to Suppress Evidence.

## II. Motion to Suppress Statements

### A. *Failure to Present Defendant to Magistrate Promptly*

 Defendant's argument that the government failed to take Defendant promptly before a magistrate without unnecessary delay essentially asserts a violation of Rule 5(a) of the Federal Rules of Criminal Procedure. Rule 5(a) states in pertinent part:

An Officer making an arrest under a warrant issued **upon a complaint** or any person making an arrest **without a warrant** shall take the arrested person without unnecessary delay before the nearest available federal magistrate judge ...

Fed.R.Crim.P. 5(a) (emphasis added).

By its plain meaning, Rule 5(a) expressly mandates the prompt presentment of an arrestee before a magistrate only in two situations: (1) where the arrest is made "upon a complaint;" and (2) where the arrest is made "without a warrant." As the Defendant was arrested pursuant to a grand jury indictment issued the previous day, the "promptness" requirement of Rule 5(a) appears inapposite. Regardless, as discussed in the following subsection, delay in bringing an arrestee before a magistrate is not dispositive of the issue of admissibility of statements made prior to arraignment.

### B. *Statements not Made Within 6 Hours Following Arrest*

 Defendant contends that statements he made more than six hours after his arrest and before his arraignment can be suppressed. Title 18, U.S.C. § 3501 does provide that voluntary confessions shall generally be admissible only if made within six hours immediately following a defendant's arrest. 18 U.S.C. § 3501(c).[9] However, by the statute's own language, "the time limitation ... shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour

**9.** Self-incriminating statements are included in the definition of "confession" under the statute.

period is found by the trial judge to be reasonable...." 18 U.S.C. § 3501(c).

The sole concern of the Fifth Amendment, on which *Miranda* is based, is governmental coercion. *Colorado v. Connelly*, 479 U.S. 157, 163–64, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). The Ninth Circuit has accordingly held that confessions given more than six hours after a person's arrest during a delay in arraignment are admissible provided the confessions are voluntary. *United States v. Halbert*, 436 F.2d 1226, 1229 (9th Cir.1970). The district court need only consider the delay as but one factor in its determination of voluntariness under 18 U.S.C. § 3501. *Id.*

In the instant case the court concludes that the delay in presenting Defendant to a magistrate was "reasonable." Defendant was not arrested until approximately 4:15 p.m. on a Friday. His arraignment the following Monday can be deemed reasonable taking the available hours of local magistrates into account. The indictment obtained prior to the Defendant's arrest further justifies his detainment over the weekend.

### C. *Violation of Defendant's Miranda Rights*

 Before the government may introduce evidence of a potentially incriminating statement made by a criminal defendant, it must prove there was a "voluntary" and "knowing, intelligent" waiver of defendant's *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). The government contends that Defendant's statements made during the two interviews are generally exculpatory in nature and are not self-incriminating. However because Defendant's statements could be considered self-incriminating in nature, their admissibility is at issue. Only Defendant's waivers made at the time of his arrest and at the first interview shall be discussed in this section; Defendant's waiver made at the time of his second interview is irrelevant for reasons discussed in subsection (i) below.

18 U.S.C. § 3501(e).

■ There is a presumption against waiver, and the burden of showing a valid waiver is on the government. *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979). However, the government need only prove by a preponderance of the evidence that an effective waiver of a defendant's *Miranda* rights was obtained. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *United States v. Binder*, 769 F.2d 595, 599 (9th Cir.1985). No written, signed waiver is required. *United States v. Calise*, 996 F.2d 1019, 1022 (9th Cir.1993); *see also United States v. Turner*, 926 F.2d 883, 888 (9th Cir.1991) ("*Miranda* does not require that defendants acknowledge their rights in writing.").

■ A valid waiver of *Miranda* rights involves a two-part inquiry. First, the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception ("voluntary" prong of *Miranda* test). *Moran v. Burbine*, 475 U.S. 412, 422–23, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Second, it must have been made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it ("knowing and intelligent" prong of *Miranda* test). *Id.*

In evaluating the "voluntariness" of a confession or self-incriminating statement, the court must determine, under the totality of the circumstances, whether "the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th. Cir.1988). The pivotal question is whether the defendant's "will was overborne." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir.1993). Factors to be considered in determining voluntariness include:

the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep. *Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047.

■ At the hearing the government persuasively showed that investigators read Defendant his rights and that Defendant fully understood and waived those rights at the time of his arrest and prior to his first interview. There is no indication that Defendant's "will was overborne" in any way. Consideration of other testimony obtained at the hearing leads the court to conclude that there were no other circumstances which impermissibly influenced or induced Defendant's waivers. Defendant's waivers were therefore wholly "voluntary."

■ The second part of the inquiry requires a determination of whether the confession or self-incriminating statement was "knowing and intelligent." A waiver is "knowing and intelligent" if it is made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421, 106 S.Ct. at 1141.

Defendant testified at the hearing that he completed five years of college education. Testimony by Special Agent Murphy also showed that Defendant was alert and cognizant of his situation when he waived his rights. Defendant also admitted to having been arrested several times before, and acknowledged familiarity with *Miranda* rights. As a result the court concludes that Defendant was fully aware of the nature his rights and consequences of his decision, thereby satisfying the "knowing and intelligent" requirement. Along with the court's finding of voluntariness, Defendant's waivers of his *Miranda* rights at the time of his arrest and before his first interview were valid.

i. *Suppression of Statements Made in Second Interview*

■ The court finds that it must, in the interests of justice, under the dictates of Fed.R.Crim.P. 52(b), suppress Baker's statements made during the April 16, 1995 interview. Rule 52(b) states: "Plain errors or defects affecting substantial rights may be

noticed although they were not brought to the attention of the court."

This court has determined that Baker requested to speak with a lawyer on April 15, 1995. Baker made this request to Detective Randy Peterson of the Vancouver Police Department. The facts leading to this request are as follows. Baker had been given his Miranda warnings by Special Agent Murphy, both at the time of his arrest, on April 14, 1995, prior to his first interview, at 12:05 a.m., on April 15, 1995, and again prior to his second interview on April 16, 1995. Murphy testified to this at the hearing and this court finds this testimony credible, despite Baker's testimony to the contrary.

At the conclusion of his first interview with Special Agent Murphy, during which time Baker waived his rights, and made no request for an attorney, Baker asked to speak with Detective Peterson alone. The testimony at the hearing revealed that Peterson had been working closely with Murphy throughout the investigation leading to Baker's arrest. Baker knew Peterson from prior dealings. According to Peterson, Baker had been a confidential informant for Peterson in Canada.

Peterson acceded to Baker's request and sat down with Baker in a private area. Baker discussed the charges against him, and denied any knowledge or involvement in them. After more discussion and at the end of their conversation Baker told Peterson "he wanted to speak with a lawyer and read his full indictment to see where he stood." *See* Peterson notes at 4. Peterson confirmed to Baker that it would be a good idea to do so. This entire exchange took place approximately 34 hours before the second, April 16, 1995 interview.

This conversation, and Peterson's notes regarding it, were not disclosed to defense counsel until the suppression hearing. The court recessed the hearing for two hours to give the government time to give a copy of Peterson's notes to the defense. When the hearing reconvened Baker's attorney did not object to introduction of the statements on the ground that the police continued to question Baker, improperly, after he made an unequivocal request for counsel. *See Ed-*

*wards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981) (all questioning must cease if person in custody requests attorney); *United States v. Cheely,* 21 F.3d 914, 922–23 (9th Cir.1994).

It is clear that Detective Peterson's assistance to Special Agent Murphy throughout the investigation, as well as his actions during the investigation of Baker, render him for these purposes an agent of the government. *See United States v. Covington,* 783 F.2d 1052, 1056 (9th Cir.1986) (constitutional guarantees secure United States citizens against acts of agents of the United States whether acting at home or abroad) (citing *United States v. Toscanino,* 500 F.2d 267, 280 n. 9 (2d Cir.1974) (whether foreigners are acting as agents of government is question of fact to be resolved in each case)); *see also United States v. Rose,* 570 F.2d 1358, 1362 (9th Cir.1978) (court must closely scrutinize the attendant facts to determine whether a joint venture between foreign and United States officials exists).

Certainly Baker believed Peterson to be in such a position. Baker no doubt believed that his request to Peterson was legitimate and would be relayed to the government agents. As such, Baker's request to Peterson for an attorney was a legitimate Sixth Amendment request for counsel. The fact that Peterson failed to relay this request to Murphy or other government officials does not relieve the government of its obligation to cease all questioning. *See Covington,* 783 F.2d at 1055 (fact that particular investigators did not have knowledge of request does not avoid prohibition against further interrogation when request was made to others within the same investigatory authority).

██ All questioning must stop when the accused invokes his right to counsel. *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1885; *Cheely,* 21 F.3d at 922. The police may make further inquiry limited only to clarifying the accused's intention. *United States v. Ogbuehi,* 18 F.3d 807, 813 (9th Cir.1994). Requests for counsel are to be given broad effect. *Connecticut v. Barrett,* 479 U.S. 523, 529, 107 S.Ct. 828, 832, 93 L.Ed.2d 920 (1987); *Robinson v. Borg,* 918 F.2d 1387,

1391 (9th 1990). "Doubts must be resolved in favor of protecting the constitutional claim." *Michigan v. Jackson*, 475 U.S. 625, 633, 106 S.Ct. 1404, 1409, 89 L.Ed.2d 631 (1986); *Smith v. Endell*, 860 F.2d 1528, 1531 n. 2 (9th Cir.1988). This court is compelled to resolve this doubt in favor of the defendant.

Nor does the fact that Baker was re-*Mirandized* prior to the second interview protect the government. The Supreme Court has stated, "we disagree . . . that fresh sets of *Miranda* warnings will 'reassure' a suspect who has been denied the counsel he has clearly requested that his rights have remained untrammeled." *Arizona v. Roberson*, 486 U.S. 675, 685, 108 S.Ct. 2093, 2100, 100 L.Ed.2d 704 (1988). A request for counsel indicates that the suspect feels unable to deal with the pressures of custodial interrogation without the presence of an attorney. *Id.* 486 U.S. at 683–84, 108 S.Ct. at 2099. Re-reading the rights, after an unequivocal request for an attorney, does nothing to alleviate these pressures. *Id.* 486 U.S. at 685–86, 108 S.Ct. at 2100.

In *United States v. Fouche*, 833 F.2d 1284, 1289 (9th Cir.1987), the court held that re-reading the rights form, combined with a *repeated* inquiry as to the suspect's understanding of those rights, a direct question regarding the suspect's desire to waive his rights, and then additional questioning "to be sure [the suspect] had in fact voluntarily chosen not to call counsel" were sufficient to show that the defendant had in fact voluntarily chosen to waive his rights after an *equivocal* request for counsel. *See also Cheely*, 21 F.3d at 923.

The facts at bar are inapposite to *Fouche*. Baker's request was in no way equivocal; he clearly stated that he wanted to speak to a lawyer. This is an explicit request, and a re-reading of his rights the next morning does not subvert the "bright line, prophylactic rule" of *Edwards* that all questioning must cease when an accused requests an attorney. *Roberson*, 486 U.S. at 681–82, 108 S.Ct. at 2098. Re-reading Baker his rights on Sunday morning was not an attempt to clarify an ambiguity in Baker's request. *See Cheely*, 21 F.3d at 922–23.

However, by this the court does not mean to indicate that there was any bad faith on the part of Detective Peterson or Agent Murphy. Peterson, as a Canadian law enforcement officer, may have quite simply been unaware of the United States Constitution's Sixth Amendment guarantees in its particulars. Moreover, the events leading up to and during Baker's arrest and detention, which took place over a three-day period and involved law enforcement officials from several agencies, may have been somewhat confusing. This information, given to a Canadian police officer who had no reason to realize its importance, may have simply slipped Peterson's mind or he may not have recognized its significance.

This court also finds that defense counsel's failure to object to the admission of Baker's statements from the second interview, on the basis that Baker had requested an attorney prior to the interview, was not a waiver of this objection, but merely a forfeiture. *See United States v. Yu–Leung*, 51 F.3d 1116, 1121 (2d Cir.1995) ("forfeiture is the failure to make the timely assertion of the right, waiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *United States v. Olano*, —— U.S. ——, ——, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993)). Baker's attorney was first notified of the existence of Peterson's notes at the suppression hearing. Moreover, Baker's attorney was presented with Peterson's notes, which contained the information that Baker had requested an attorney, just shortly before the hearing reconvened.

As such, it would be plain error for this court to overlook the evidence showing that Baker did, unequivocally, invoke his right to counsel. *See* Fed.R.Crim.P. 52(b). If this court were to overlook this evidence, the "error [would be] 'so plain [that this judge would be] derelict in countenancing it, even absent the defendant's timely assistance in detecting it.'" *Yu–Leung*, 51 F.3d at 1121 (quoting *United States v. Shaoul*, 41 F.3d 811, 817 (2d Cir.1994) and *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982) (internal quotation omitted)).

Accordingly, this court GRANTS Defendant's Motion to Suppress Statements, as to any statements Baker made after he requested an attorney on April 15, 1995. The court DENIES Defendant's Motion to Suppress Statements, as to any statements made by Baker during the first interview and made to Peterson during their private conversation before Baker requested counsel.

## CONCLUSION

For the reasons stated above, the court DENIES Defendant's Motion to Suppress Evidence, and DENIES in part and GRANTS in part Defendant's Motion to Suppress Statements.

IT IS SO ORDERED.